**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LISA HATCH,** | : | |
| **Plaintiff** | : | **No. 1:14-cv-2318** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | **(Magistrate Judge Carlson)** |
| **FRANKLIN COUNTY JAIL and** | : | |
| **JAMES SULLEN,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court is Defendants Franklin County Jail and James Sullen's motion for

summary judgment.  (Doc. No. 77.)  For the reasons that follow, the Court will grant the motion.

**I.     BACKGROUND**

**A.     Procedural Background**

On December 5, 2014, Plaintiff Lisa Hatch ("Hatch") initiated the above-captioned action

by filing a complaint against Defendants Franklin County Jail ("the County") and Captain James

Sullen ("Sullen").[1]  (Doc. No. 1.)  In her initial complaint, Hatch asserted claims against both

Defendants for violations of the Americans with Disabilities Act ("ADA"), and the Family and

Medical Leave Act ("FMLA"), as well as a claim against the County for a violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), in connection with her termination of employment

in March of 2014 and allegedly hostile work environment.  (Id.)  After Defendants moved to

dismiss the initial complaint on the grounds that it failed to state a claim upon which relief may

be granted (Doc. No. 9), Hatch filed an amended complaint on February 10, 2015 (Doc. No. 11).

Consequently, Defendants' motion to dismiss was denied as moot.  (Doc. No. 15.)  In her

amended complaint, Hatch asserted claims for violations of the ADA on the part of the County,

---

[1] When discussing both the County and Sullen together, the Court will refer to them as "Defendants."

1

violations of the FMLA by both Defendants, and a violation of Title VII by the County. (Doc. No. 11.) Subsequently, on August 7, 2015, Hatch filed a second amended complaint, which included additional claims under the Pennsylvania Human Relations Act ("PHRA"). (Doc. No. 31.)

After the parties engaged in extensive discovery, Defendants filed a motion for summary judgment on December 30, 2016 (Doc. No. 77), with a brief in support (Doc. No. 78), as well as a statement of material facts (Doc. No. 71). On January 25, 2017, Hatch filed a brief in opposition to Defendants' summary judgment motion as well as a counterstatement of material facts and accompanying exhibits (Doc. No. 84), and Defendants submitted a reply brief on February 8, 2017 (Doc. No. 85). Defendants' motion is ripe for disposition.

### B. Factual Background

#### 1. Franklin County Jail Administration and Policies

The County operates Franklin County Jail ("FCJ"), which is located in Chambersburg, Pennsylvania.[2] (Doc. No. 71 ¶ 1.) The FJC employs approximately eighty-five individuals, including correctional officers, and the FJC correctional officers are "subject to FCJ procedures, Franklin County policies and procedures, and the terms of a Collective Bargaining Agreement." (Id. ¶¶ 2-3.) Correctional officers are given copies of the applicable policies and sign acknowledgments indicating they received them. (Id. ¶ 4.) Correctional officers also receive

---

[2] The following relevant facts of record are taken from Defendants' statement of material facts (Doc. No. 71), unless otherwise noted. Defendants' statement of material facts contains specific citations to the record in each numbered paragraph. Unless otherwise specified, the facts recited in this section are deemed undisputed. There are several instances where Hatch admits that a statement was made, but disputes the import of that statement or testimony. (Doc. No. 84-2.) For purposes of concision and confining the Court's analysis only to a determination of whether there is a genuine dispute of material fact, the Court will not address those disputes. In addition, the evidence submitted by the parties is extensive. However, the Court will concern itself only with the facts that are relevant to Defendants' motion.

training on certain topics, including sexual harassment.  (Id. ¶ 5.)  Daniel Keen ("Keen") held the

position of Prison Warden from 2011 to 2014, and Sullen, who currently serves as the Deputy

Warden of Security at FCJ, held the position of Captain at FCJ from 2008 until 2014.  (Id. ¶¶ 7-

8.)  The FCJ is divided into several units, labeled A through G, "which house inmates in the

general and work release populations," as well as M, the medical unit.  (Id. ¶ 10.)

FCJ's standards of conduct require staff to refrain from engaging in sexual relationships

or contacts with inmates or becoming involved with inmates in an emotional, physical, or sexual

way, and also prohibit engaging in "conduct unbecoming of a correctional officer, which

includes sexual harassment."  (Id. ¶ 11.)  The code of conduct refers to FCJ's legal obligations

under the Prison Rape Elimination Act ("PREA"), which governs the "investigation and

prevention of sexual assault inside the FCJ."  (Id.)  In addition, FCJ also has a specific grievance

procedure for inmates, which is set forth in the FCJ Inmate Handbook, while inmates may use

"request slips" to raise "more routine concerns."  (Id. ¶ 13-14.)

FCJ policy prohibits staff from fraternizing with inmates, which includes "engaging in

conduct that is too personally familiar and developing a personal relationship or friendship with

an inmate, and includes the sharing of personal information with an inmate."  (Id. ¶ 16.)  If the

FCJ becomes aware of an allegation of sexual conduct or impropriety involving an inmate, the

FCJ is obligated to investigate the allegations pursuant to the PREA.  (Id. ¶ 18.)

## 2.      FCJ Procedures for FMLA Leave Requests and Medication Policy

If an employee of the FCJ requests leave pursuant to the FMLA, the request "must be

made through the Human Resources Department," through a process removed from other prison

staff.  (Id. ¶ 26.)  FCJ's general policy with respect to FMLA leave or other accommodations is

to notify the given employee's supervisors if any of the employee's requested leave is granted,

"but they are generally not told the reason for the leave if it is not necessary to the [employee's] position or employment." (Id. ¶ 29.) In addition, FCJ employees are required to adhere to the County's Medication Policy, which requires employees to inform their supervisors "of any medications taken which could impact their employment," including "narcotics and any other medications with side effects impacting memory, balance, lucidity, speech, or causing drowsiness." (Id. ¶ 33.)

### 3.    Hatch's Employment with FCJ

Hatch was employed by FCJ as a correctional officer from November 3, 2008, until her termination on March 31, 2014. (Id. ¶¶ 39, 113.) During the hiring process, Hatch did not disclose her mental health issues to FCJ (Id. ¶ 41), which included a history of depression and anxiety. (Id. ¶ 38.) In March of 2013, Hatch began to take Zoloft after she began experiencing headaches and difficulty sleeping. (Id. ¶ 63.) She also underwent a psychiatric evaluation in July of 2013 and reported that Zoloft had "assisted her greatly, and that she had been experiencing anxiety symptoms for a year." (Id. ¶ 64.) In June of 2013, the FCJ administration became aware of Hatch's use of medication after Hatch had discussed her mental health with another correctional officer. (Id. ¶ 65.) Hatch was then "seen at Keystone Behavioral Health for Psychotherapy beginning in October of 2013."[3] (Id. ¶ 68.)

Hatch's employment history with FCJ involved a series of disciplinary issues, which included allegations of improper conduct on the part of Hatch while acting in her capacity as a

---

[3] After Hatch initiated the instant action against Defendants, Hatch underwent an independent medical examination on May 5, 2016, with regard to her mental health issues. (Doc. No. 71 ¶ 125.) However, the Court does not consider any discussion of the medical examination necessary for purposes of analyzing Defendants' motion.

correctional officer.[4]  Caleb Barnett ("Barnett"), another correctional officer, stated that he

"witnessed Hatch act unprofessionally."[5]  (Id. ¶¶ 70-71.)  Barnett testified that he saw Hatch act

unprofessionally "while supervising inmates, in that he saw her passing gas loudly and

commenting on same."  (Id. ¶ 71.)  Barnett further stated that Hatch wore "a hand sanitizer bottle

on her duty belt in the shape of a pink cat, which she would tell staff and inmates was her 'pussy'

or 'pussy cat.'"  (Id. ¶ 72.)  Another correctional officer employed at FCJ at the same time as

Hatch, Emmert Heck ("Heck"), stated that inmates had complained to him "on one

occasion…that [Hatch] was foul-mouthed when interacting with them."  (Id. ¶ 76.)

### 4.  Inmate Allegations and Investigation of Hatch

#### a.  Allegations and Interviews

On February 17, 2014, inmate Karl Rogers ("Rogers"), who was housed on the medical

unit where Hatch was stationed, complained to FCJ nurses about Hatch's behavior toward him.

(Id. ¶ 89.)  The nurses authored incident reports, which they provided to FCJ administration on

February 18, 2014.   (Id.)  Rogers' allegations were described as follows:[6]

> Hatch spoke about her boyfriend and how they had not had sex in months;
> describe[d] her boyfriend's health issues; provided him with her Facebook
> information; confirmed the two had extended conversations; describe[d] a
> threesome with Officer Caleb Barnett, who she had a crush on; that Hatch would
> flick her tongue at him; carried a hand sanitizer bottle in the shape of a pink cat
> which she referred to as her "pussy" and asked if he wanted to play with it; pass
> gas loudly and on one occasion then referenced anal sex with him; told him she
> took "psycho meds for her nerves"; told him she had two degrees and was from
> New York; complained about her job and that she was not chosen for the CTS

---

[4] There is an extensive factual background with respect to Hatch's employment history at FCJ,
particularly in regard to alleged instances of improper conduct on the part of Hatch.  However,
the Court will not address any allegations that are not relevant for purposes of Defendants'
motion.
[5] While Hatch disputes the import or value of Barnett's testimony, Hatch admits that Barnett
testified in that manner.  (Doc. No. 84-2 ¶ 71.)
[6] While Hatch disputes Rogers' characterization of her conduct, Hatch admits that Rogers did
make these allegations.  (Id. ¶ 90.)

> [correctional treatment specialist] position; discussed the relationship between a
> CTS and a [correctional officer] [and] alleged the same conduct had occurred to a
> former inmate, Cary Thomas.

(<u>Id.</u> ¶ 90.)

Rogers' allegations prompted an investigation of Hatch, and on February 18, 2014,
Rogers was interviewed by Sullen and Deputy Warden Michelle Weller ("Weller"), "the PREA
Investigation Team." (<u>Id.</u> ¶ 91.) Rogers was interviewed again on February 19, 2014, after he
told his correctional treatment specialist that he "had additional information regarding Hatch."
(<u>Id.</u>) During the second interview, Rogers "reported two (2) additional instances of misconduct."
(<u>Id.</u>) Sullen consequently prohibited Hatch from working on the medical unit pending the
completion of the investigation into Rogers' allegations. (<u>Id.</u>) Sullen then reviewed video
footage of Hatch during the period of time when she was stationed on the medical unit, and
"[t]he PREA team intended to speak with her on [February] 19th regarding the allegations." (<u>Id.</u>
92.) Hatch did not report to work on February 19, after she had called in sick, and on February
19 and February 20, Sullen asked Heck and another officer ("Wingert") each to author an
incident report. (<u>Id.</u> ¶ 93.)

Heck also stated that other inmates housed on the medical unit had reported to him that
Hatch engaged in inappropriate behavior around them, including that she would "stand by their
cells and watch them urinate." (<u>Id.</u> ¶ 95.) While Heck stated that he had previously received
many complaints from inmates "on a variety of subjects," the only instance in which he received
complaints regarding sexual comments made by an officer to an inmate occurred in regard to
Rogers' allegations concerning Hatch. (<u>Id.</u> ¶ 97.)

On February 24, 2014, Sullen was informed "that Hatch was upset she was not permitted
on the Medical Unit and was not told the reason," and on that same date, Sullen reviewed the

video of Hatch while she was stationed on the Medical Unit.  (Id. ¶ 98.)  Hatch was then

interviewed by the FCJ PREA team on February 25, 2014.[7]  (Id. ¶ 99.)

### b.  Hatch's Incident Report and Subsequent Request for Leave

After Hatch was interviewed, Sullen asked her "to write an [i]ncident [r]eport regarding

her interactions with Rogers," and Hatch "went to Central Control to write the report."  (Id. ¶

100.)  While in Central Control, Hatch contacted Sullen, "and then, as referred, Warden Keen,"

to request medical leave due to her mental health conditions, which included her anxiety.[8]  Hatch

subsequently went to Human Resources on February 26 and requested FMLA leave, which "was

granted effective February 26, 2014, until March 25, 2014."  (Id. ¶ 101.)

Also on February 26, 2014, Sullen and Weller "conducted another more extensive

interview of Rogers" based on Heck and Winger's incident reports and video footage of Hatch

when she was stationed on the Medical Unit.  (Id. ¶ 102.)  When Hatch's FMLA leave was

granted, the investigation was "generally on hold until Hatch returned," although interviews were

still conducted at the end of February of 2014.  (Id. ¶ 103.)  On February 27, Sullen and Weller

interviewed Barnett, who stated that Rogers "had also come to him with the allegations, as had

other [correctional officers], and also that Hatch had contacted him on Facebook."  (Id. ¶ 104.)

Barnett told Sullen that Rogers approached him and said he had "filed a grievance naming

---

[7] Although Hatch admits that she was interviewed about Rogers' allegations on February 25, 2014, she appears to debate the scope of any admissions made to the PREA team during the interview.  (Doc. No. 84-2 ¶ 99.)

[8] Defendants characterize this request as a result of Hatch claiming she was "distressed by the allegations." (Doc. No. 71 ¶ 110.)  However, Hatch admits only that she "requested to take administrative leave because of her mental health conditions" and claims that she told Sullen she was experiencing anxiety.  (Doc. No. 84-2 ¶ 100.)  The parties also dispute the manner in which this conversation ended.  While Defendants state that Keen requested a list of medications that Hatch was taking, in light of Defendants' view that such medications "were impairing her ability to perform her duties" (Doc. No. 71 ¶ 100), Hatch alleges that, in response to her request for leave, Sullen stated, "you're not fucking going anywhere until this report is done" (Doc. No. 84-2 ¶ 100).

Barnett" after Hatch had told him that "she wished to have a threesome with Barnett and Rogers, and that Rogers had reported it."[9] (Id. ¶ 105.)

### c. March 25, 2014 Interview of Hatch

In early March of 2014, Rogers wrote to Franklin County officials and filed an additional grievance regarding the allegations concerning Hatch, as well as several inmate request slips. (Id. ¶ 107.) On March 24, Hatch returned from her FMLA leave to full duty as a correctional officer.[10] (Id. ¶ 108.) On March 25, Hatch was interviewed by Sullen, Weller, and Carrie Aaron ("Aaron"), an employee from Human Resources. (Id. ¶ 110.) During the interview, Hatch was questioned about Rogers' allegations, and she admitted to discussing her mental health with Rogers and doing "things to make him laugh, like sing[ing] songs, stick[ing] out her tongue and other things."[11] (Doc. No. 84-2 ¶ 110.) At the end of the meeting, Hatch received a Loudermill notice[12] informing her that Rogers' allegations provided FCJ with just cause for disciplining her. (Doc. No. 71 at ¶ 111.)

---

[9] Barnett testified that, prior to Rogers' report, he was "aware that Hatch had a 'crush' on him due to unsolicited comments made by various other inmates on multiple dates," who would make references to a relationship between Barnett and Hatch. (Doc. No. 71 ¶ 106.) While Hatch denies engaging in inappropriate conduct with respect to Barnett, she admits that he testified as indicated above. (Doc. No. 84-2 ¶ 106.)

[10] In the meantime, on March 21, 2014, Hatch returned the paperwork concerning her FMLA leave to Human Resources, and made reference to a 2011 incident involving Lieutenant Scavitto "as an example of mistreatment in the jail." (Doc. No. 71 ¶ 108.) When an employee from Human Resources, Carrie Aaron, mentioned this incident to Sullen and Weller on March 27, 2014, Sullen and Weller "could barely then recall the 2011 incident and noted Scavitto had left the FCJ shortly thereafter." (Id.)

[11] While Hatch disputes that her conduct with respect to Rogers or other inmates was inappropriate, she admits engaging in certain behavior that formed the basis for the investigation and cites her own deposition testimony to support her argument that she did not behave inappropriately, but rather, in such a way as to build a rapport with inmates. (Doc. No. 84-2 at ¶ 110.)

[12] A Loudermill notice is a formal notice provided to a public employee notifying the employee of the employer's intent to terminate him or her, to which the employee is given an opportunity to respond. The process for providing an employee with such notice was articulated by the

#### d.    Sullen Memorandum

Sullen completed a memorandum "[b]etween March 25, 2014 and March 31, 2014"

discussing the findings of the investigation into Hatch's conduct.  (Id. ¶ 112.)  The memorandum

provided, in relevant part:[13]

> On February 17, 2014, I received a report that inmate Karl Rogers was alleging
> inappropriate conduct by Officer Hatch on February 5 and 12 of 2014.  On
> February 18, 2014 inmate Rogers was interviewed.  During the interview inmate
> Rogers stated that Officer Hatch would come by his cell and flick her tongue out
> at him.  That Officer Hatch told him she hadn't had sex with her boyfriend for
> four months and that she wanted to fuck him.  He alleged that Officer Hatch had
> given him Facebook contact information, saying she wanted to get with him in a
> sexual way.  Another claim was made that Office Hatch told him that she wanted
> to have a threesome with him . . . [and] Officer Barnett who as stated by inmate
> Rogers Officer Hatch had a crush on.
>
> A second interview was conducted on February 19, 2014.  Inmate Rogers
> requested to be seen stating he had more information about the alleged incident. .
> . . He made reference to the hand sanitizer container that she carried on her belt
> loop in the shape of a pink cat.  He stated that Officer Hatch asked him if he
> wanted to play with [her] pink pussy.  Then she stated not this one . . . pointing to
> her buckle, this one . . . pointing to her crotch.
>
> Inmate Rogers stated another comment was made while they were at the
> microwave.  Officer Hatch farted and said "oh I'm sorry that wasn't very lady
> like."  Then she [referred to having anal sex with Rogers].
>
> Inmate Rogers was asked if there had been any physical contact and stated no.
>
> On February 26, 2014 a follow up interview was conducted with inmate Rogers
> after video review was completed.  I questioned him again if there had been any
> physical contact with Officer Hatch.  Again he stated that at no time did she touch
> him or [Rogers] touch her.
>
> During the interview inmate Rogers alleged that Officer Hatch told him more
> about her personal life.  Told him she took pyscho meds for her nerves. . . . Told

---

Supreme Court in Cleveland Board of Education v. Loudermill.  See Cleveland Bd. of Educ. v.
Loudermill, 470 U.S. 532 (1985).

[13] The entire memorandum is docketed on the record as Docket Number 73-1, Exhibit PP.  In
light of the explicit nature of some of the allegations, the Court declines to recite the
memorandum fully and will include only the portions of the memorandum most relevant to the
Court's discussion.

him about the issues her boyfriend is having with his leg and that he may end up without a leg. Inmate Rogers stated that Officer Hatch would complain to him about her job. . . .

On February 25, 2014, Officer Hatch was interviewed regarding the complaint filed against her. During that interview Officer Hatch stated that there was never any physical contact between her and inmate Rogers. Officer Hatch went on to say that she talked to inmate Rogers about his fall in the shower and he asked her to go to court for him….

Officer Hatch stated that she would build [Rogers] up – "praise him up." Went on to say that she told him her boyfriend is disabled and wish[ed] he had an upbeat attitude like him and that he was going to lose his leg.

Officer Hatch was asked if there was a reason inmate Rogers might feel uncomfortable around her. First she stated not really and then went on to say that . . . one time he was sitting with me and Morrow came in, Rogers left and Morrow said he looked suspicious. Officer Hatch was on video sitting down with inmate Rogers having a conversation for approximately 24 minutes and 30 seconds at the Officer Station.

Officer Hatch was asked about flicking her tongue and stated that she talks to a lot of inmates. Makes faces, smile[s] at them, not just Rogers. Officer Hatch even demonstrated how she makes faces by putting her thumbs in her ears and making a blowing motion with her tongue hanging out of her mouth.

Officer Hatch admitted to having a conversation with inmate Rogers about Officer Barnett. Stating that Barnett comes on the unit, shuffles back and forth and Rogers said "I think he has a crush on you" . . . but I (Hatch) think he's too young for me. I have a boyfriend.

Officer Hatch…informed me she talked to an inmate for 20 minutes the day before…Officer Hatch continued to reference time getting to spend talking to [an] inmate. Stating that if she can get five minutes to talk to them. This was in reference to being on a regular Unit. Stating that on M-Unit she has more time, one officer to eight inmates.

On March 25, 2014, a follow up interview was conducted. Officer Hatch stated that no physical contact took place between inmate Rogers and herself. This was [a] recap of the events that took place as Officer Hatch was returning to work.

Officer Hatch was asked if she thought [if] she got [too] close to this inmate. She replied, I think I have probably gotten [too] close with most of the inmates.

It is [found] that there wasn't any sexual contact that took place between Officer Hatch and inmate Rogers. Officer Hatch did confirm [the] allegation that was made by inmate Rogers about flicking her tongue.

Officer Hatch confirmed that she was engaging in conversation with inmate Rogers about Staff and gave her opinion about their babies.

Officer Hatch confirmed she told inmate Rogers about her boyfriend's personal health condition.

Officer Hatch during questioning . . . revealed inappropriate conduct towards the Treatment Department as a whole because she was not selected for the CTS position.

Officer Hatch while working on her units has taken on the mindset that she is a CTS and it is her job to conduct counseling of the inmates when she is assigned to a unit. Stating [that] she prefers M-Unit over other units because of the one to eight ratios, which allows her more time.

Officer Hatch made a choice to confide [in] inmate Rogers and in doing so became [too] close with the inmate allowing herself to lose . . . her position as a Correctional Officer. This . . . lack of professionalism [led] to the inappropriate conduct.

This type of conduct is unbecoming of an Officer and detrimental to the spirit of our organization.

(Doc. No. 73-19 at 1-3.)

In concluding the memorandum, Sullen cited numerous FCJ policies regarding appropriate standards of conduct for FCJ employees that he found Hatch had violated. (Id. at 3.) Sullen then stated that, "[a]fter concluding the investigation into Officer Hatch's inappropriate conduct I am recommending Officer Hatch for termination." (Id.) On March 31, 2014, Hatch was terminated from her employment with FCJ. (Doc. No. 71 ¶ 113.)

### e.    Hatch's Response to Inmate Allegations

Hatch admits to some of the conduct alleged by Rogers, but denies that it was inappropriate. Hatch admits to speaking with Rogers for an extended period of time.

(Doc. No. 84-2 ¶ 114(a).)  While Hatch denies that she made "any sexual remarks or expressions" to Rogers, she "indicated that she would sing songs and make funny faces to try to cheer him up because he expressed he was depressed, was a suicide risk and had health problems."  (Id. ¶ 114(b).)  Further, Hatch admits that she had shared personal information with Rogers regarding her significant other, including information about him having a clotting disease and health issues pertaining to his leg, in addition to personal information about her being from New York.  (Id. ¶ 114(c).)

In addition, while denying that she and Rogers discussed Barnett, Hatch appears to state that Rogers "told her that Barnett had a crush on her to which [she] responded that she didn't know whether Barnett had a crush on her or not."  (Id. ¶ 114(d).)  Hatch also admitted that she wore a pink hand sanitizer bottle shaped like a cat on her belt in front of inmates.  (Id. ¶ 114(e).)  Moreover, she admitted "telling Rogers that she had anxiety and depression, and took medications that assisted her with these problems," and she also told him that she had two degrees.  (Id. ¶¶ 114(f), (g).)  Hatch also "told Sullen that she believed she 'got too close' to the inmates"[14] (Id. ¶ 114(i)), and admitted contacting former inmates on Facebook.  (Id. ¶ 114(j).)  Finally, Hatch admitted that she had told the PREA team that she "found some of the male inmates attractive" and also stated this in her deposition.  (Id. ¶ 114(k).)

## II.     LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the

---

[14] Hatch admits to making this statement, but alleges that she "explained to Sullen that by getting 'too close,' she meant that the job of correctional officer is care and custody and that she took the care part very seriously."  (Doc. No. 84-2 ¶ 114(i).)

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis for allowing a reasonable factfinder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2007). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotext Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 US. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and

more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Mem'l Hosp., 192 F. 3d 378, 387 (3d Cir. 1999).

## III.   DISCUSSION

Hatch asserts several claims against Defendants.  Hatch brings claims for disability discrimination under the ADA and PHRA, retaliation under the FMLA, and gender discrimination under Title VII and the PHRA.  The Court addresses each claim in turn.

### A.      Disability Discrimination Claims

#### 1.      Legal Standard Applicable to Disability Discrimination Claims Under the ADA and PHRA[15]

Disability discrimination claims under the ADA and PHRA are analyzed pursuant to the same legal standard.  Colwell v. Rite Aid Corp., 602 F. 3d 495, 499 n.3 (3d Cir. 2010) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).  Therefore, the Court will address these claims simultaneously.  Disability discrimination claims under the ADA and PHRA may be analyzed under the McDonnell Douglas burden-shifting framework.  McCarty v. Marple Twp. Ambulance Corp., 869 F. Supp. 2d 638 (E.D.P.A. 2012) (applying McDonnell Douglas framework to ADA claim).  Pursuant to this framework, a plaintiff must first establish a prima facie case of discrimination by showing that: she has a disability; she was qualified for the position with or without a reasonable accommodation; and she suffered an adverse employment action as a result of her disability.  Williams v. Phila. Housing Authority Police Dept., 380 F.3d 751 (3d Cir. 2004).  Once a plaintiff establishes a prima facie case, the defendant then bears the burden of producing a legitimate non-discriminatory reason for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant makes this

---

[15] Hatch brings claims for disability discrimination against both the County and Sullen individually because the PHRA appears to contemplate individual liability for a violation.  The Court will address the claims against both Defendants in this section.

showing, then the burden shifts back to the plaintiff to establish that the defendant's asserted reason was actually a pretext for discrimination.  Id. at 804.

In proving pretext, "a plaintiff . . . may survive a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d. Cir. 1994).

> "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"

Id. at 765 (alteration in original) (citations omitted).

## 2.      Hatch's Disability Discrimination Claim

Defendants argue that Hatch has failed to produce evidence sufficient to establish a prima facie case of disability discrimination because she cannot show that she was terminated because of her disability.[16]  (Doc. No. 78 at 7.)  Hatch, however, asserts that she is able to make out a prima facie case because her evidence is sufficient to permit a factfinder to find that her disability was the cause of her termination.  (Doc. No. 84-1 at 8.)  The Court declines to resolve the issue of whether Hatch has shown a prima facie case of disability discrimination because the

---

[16] Hatch asserts that she suffered from a disability because she "suffered from major depression and panic disorder at the time of her termination from employment."  (Doc. No. 84-1 at 8.)  Defendants do not appear to dispute whether Hatch suffered from a disability for purposes of whether Hatch is able to establish a prima facie case of disability discrimination.  (Doc. No. 78 at 7.)  Given that Defendants have not challenged this aspect of Hatch's ability to establish a prima facie case, the Court assumes that Hatch suffered from a disability at the time of her termination.

Court has concluded that, even assuming Hatch has established a <u>prima</u> <u>facie</u> case of disability discrimination, she has failed to produce sufficient evidence to permit a reasonable factfinder to conclude that Defendants' proffered reason for her termination was pretextual.

Defendants' stated explanation for terminating Hatch was that "the termination was motivated by the admitted transgression of policies intimately related to the security of the institution and the safety of the staff and inmates therein." (Doc. No. 78 at 9.) Hatch bears the burden of pointing to evidence sufficient to permit a reasonable factfinder to conclude that Defendants' asserted reason for her termination is a pretext for discrimination on the basis of her disability. For Hatch's claims to survive summary judgment when an employer has articulated a legitimate, non-discriminatory reason for its adverse employment action, the burden shifts to Hatch to demonstrate pretext by showing evidence permitting a factfinder to "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006) (quoting <u>Fuentes</u>, 32 F.3d at 764). Hatch points to several pieces of evidence that she maintains are sufficient for a factfinder to reasonably disbelieve Defendants' stated reason for her termination, or believe that a discriminatory reason for her termination was more likely than not a motivating or determinative cause of Defendants' action. The Court addresses each piece of evidence in turn.

### a. Comments by Keen and Sullen

Hatch asserts that she is able to support her claims of disability discrimination using both direct and circumstantial evidence. (Doc. No. 84-1 at 2, 5.) She claims that remarks made by Sullen prior to her termination constitute direct evidence on the basis of disability, alleging that she "was specifically told by Sullen that he believed that because of Ms. Hatch's disability and

medications, she could not work for Defendants."[17]  (Id. at 5.)  Hatch also states that

circumstantial evidence supports her claim.  She states that when she notified Keen of her

problems with Lt. Scavitto, Keen responded by saying "that she was having a mental health

problem and that if her mental health problem was that bad, she should 'go find [a] job

someplace else.'"  (Id. at 9.)  Next, Hatch relies on alleged conversations between her and Keen

"about her anxiety condition," stating that she asked Keen if he ever experienced anxiety, and

that Keen responded by saying "I just take a deep breath and get on [with] my day."  (Id.)  Hatch

also points to Sullen's alleged statement to her regarding the incident report that "you're not

fucking going anywhere until this report is done."  (Id. at 10.)  Further, Hatch makes multiple

assertions that she was subjected to derogatory comments by Sullen and other correctional

officers regarding her disability.  (Id.)

    In opposing Defendants' motion for summary judgment, Hatch generally relies on her

own deposition, particularly in regard to comments she claims were made to her by Sullen and

Warden Keen.  (Doc. No. 84-1 at 9-10.)  However, Hatch's reliance on her own testimony may

not be sufficient in order to defeat a motion for summary judgment.  LeBoon v. Lancaster Jewish

Community Ctr. Ass'n, 503 F.3d 217, 232 n.9 (3d Cir. 2007); Solomon v. Society of Automotive

Engineers, 41 F. App'x. 585, 586 (3d Cir. 2002); Cridland v. Kmart Corp., 929 F. Supp. 2d 377,

389-90 (E.D. Pa. 2013); Fusco v. Bucks Cty., No. 08-2082, 2009 WL 4911938, at *11 (E.D. Pa.

Dec. 18, 2009).  Further, Hatch supports her assertion "that Sullen spoke disparagingly about

---

[17] Hatch states that this statement constitutes "direct evidence which warrants denial of
Defendants' [m]otion regarding Ms. Hatch's actual and perceived disability discrimination
claims."  (Doc. No. 84-1 at 5.)  However, this appears to be the extent of Hatch's evidentiary
support for her claims that she considers direct evidence, and she also states that she can prevail
on her claims using circumstantial evidence of discrimination.  Accordingly, the Court will
analyze her claims under the relevant framework associated with alleged circumstantial evidence
of discrimination.

[her] mental health conditions in the presence of staff and inmates, including . . . how he believed her medications affected her ability to perform the job" with a certification from a former employee of the County, which states only that "other staff members, including but not limited to Captain Sullen, disclos[ed] personal information about Ms. Hatch's medical conditions in front of inmates and other staff members (including the effects that her medical condition has on her ability to do her job.)" (Id. at 10, Doc. No. 84-1, Ex. T at 1, ¶ 8(b).) However, this certification presented by Hatch does not include specific factual details, and consequently, it does not constitute evidence sufficient for Hatch to persuade a reasonable factfinder that she was more likely than not terminated because of her disability.

Further, Hatch states that "within days prior to her termination, Captain Sullen specifically told Ms. Hatch that the sexual harassment allegations were 'dropped' and that he was simply going to issue her a written discipline. But then, after making discriminatory comments about her disabilities and medications, he recommended her termination." (Id.) In support of this assertion, Hatch points only to her own deposition. (Id.) Further, Hatch states that pretext is demonstrated by "[t]he fact that Defendants also made disparaging disability-related comments to Ms. Hatch's co-workers." (Id.) To that end, Hatch cites two certifications from former employees of the County. One certification states, in relevant part, that "other staff members," including Defendant Sullen, allegedly disclosed personal information about Hatch's medical condition in front of other inmates and prison staff. (Id., Ex. T at 1.) The other certification states that staff members had made "derogatory comments" regarding Hatch's disabilities and "would specifically reference her anxiety and depression." (Id., Ex. V. at ¶ 11-13.) However, neither of these certifications provides more specific allegations other than the statements described.

### b.     Comparative Evidence of Non-Disabled Correctional Officers

In opposition to Defendants' motion regarding her ADA claim, Hatch also points to evidence of the treatment of non-disabled correctional officers, which she maintains demonstrates that disability discrimination was a motivating or determinative factor in her termination.  However, Hatch's proffered comparative evidence is insufficient because the correctional officers to whom she refers are not similarly situated for purposes of establishing pretext.  Employees who engage in "vastly different conduct" or conduct of differing degrees of seriousness are not considered similarly situated.  Ade v. KidsPeace Corp., 698 F. Supp. 2d 501, 515 (E.D. Pa. 2010).  Even though Hatch states that non-disabled correctional officers "who engaged in the same or even more egregious conduct than Ms. Hatch is alleged to have engaged in" (Doc. No. 81-4 at 10), were not terminated as a result of their conduct, the Court is not persuaded that these individuals took part in "the same or even more egregious conduct" than Hatch allegedly did.  Hatch refers to six examples of discipline involving non-disabled correctional officers who, according to her, "demonstrate that Defendants treated Ms. Hatch's male/non-disabled co-workers much more favorably than her and did not issue appropriate discipline/termination, as per policy."  (Doc. No. 84-2 at 2, ¶ 25.)  Despite Hatch's characterization of their misconduct, however, these employees are not similarly situated for purposes of analyzing her disability discrimination claim.

Hatch asserts that one of the officers, Sheldon Cross, who was found to have "failed to maintain [his] professional distance with inmates based upon [his] willingness to share personal information with them," was "merely suspended for this incident and not terminated for it." (Id. at 3.)  However, despite including the applicable documentation in one of her exhibits (Id., Ex.

E), Hatch omits any discussion of Cross's subsequent resignation after he was seen fraternizing with inmates and his termination was recommended.  (Id. at 3.)

Hatch also refers to a correctional officer who was disciplined by Sullen for violating the County's policies by having an inappropriate discussion with a female inmate regarding pictures on the inmate's cell phone.  (Doc. 84-2 at 5.)  This officer's conduct does not rise to the same level of the transgressions of which Hatch was accused and, in some instances, to which Hatch admitted.  Hatch also cites the suspension of another correctional officer, who allegedly engaged in "inappropriate conduct towards an inmate" when he gave the inmate his phone number and threatened the inmate with formal discipline if she reported it to his supervisor.  (Id. at 7.) Comparing this conduct to the conduct alleged by Rogers, the Court finds that Hatch's proffered comparative evidence does not create a genuine issue of material fact with respect to pretext.

Further, the remainder of Hatch's purported comparative evidence is similarly unpersuasive in establishing pretext.  Hatch refers to the disciplinary history of a male correctional officer who was "merely suspended" after he was "found to have made claims which were 'potential harassment/sexual harassment' about [another officer]."  (Id. at 9.)  Aside from the fact that both Hatch and this officer were apparently disciplined for "discrimination/harassment," Hatch does not show that she and this other officer would be similarly situated for purposes of showing that her termination was a pretext for discrimination. In addition, this officer allegedly acted inappropriately toward another officer, while Hatch was investigated as a result of allegations brought against her by an inmate.  This distinction further illustrates the strength of Defendants' legitimate, non-discriminatory reason for terminating Hatch, which ultimately concerns the safety and security of inmates.  In sum, the Court concludes that Hatch has not pointed to evidence sufficient to cast doubt on Defendants'

proffered reasons for her termination in order for her claims to survive summary judgment.[18]

Accordingly, Defendants are entitled to summary judgment on Hatch's ADA and PHRA

disability discrimination claims.

### 3.  Legal Standard Applicable to ADA and PHRA Disability Discrimination Claims: Retaliation[19]

Retaliation claims asserted under the ADA and PHRA are also analyzed using the

McDonnell Douglas burden-shifting framework.  Williams, 380 F.3d at 759 n.3.  First, the

plaintiff must establish a prima facie case, which requires a showing that (1) she was engaged in

"protected activity," (2) she experienced an adverse employment action, and (3) there was a

causal connection between the employee's involvement in protected activity and the adverse

employment action.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).

If an employee requests a reasonable accommodation from her employer or complains of

disability discrimination on the part of her employer, that employee is deemed to have engaged

in protected activity for purposes of a retaliation claim.  Fogleman v. Greater Hazleton Health

Alliance, Inc., 122 Fed. Appx. 581, 585 (3d. Cir. 2004); Szostek v. Drexel Univ., No. 12-2921,

2013 WL 4857989, at *14 (E.D. Pa. Sept. 11, 2013).  Further, in regard to the "causal

connection" prong, a plaintiff may establish a causal connection through either direct or

---

[18] Hatch also cited to the disciplinary treatment of two other male correctional officers, Officers Jones and Heck.  Jones allegedly made an inappropriate comment to another correctional officer but was not terminated for it, (Doc. No. 84-2 at 10), while Heck had received multiple grievances from inmates who complained that he frequently used racial slurs, but apparently was not formally disciplined as a result of these allegations.  (Id. at 11.)  The accusations involving Jones differ from Hatch's alleged conduct because they did not involve accusations of an inappropriate relationship with an inmate.  Further, Heck's disciplinary history is inapposite because the conduct of which Heck was accused is entirely different from Rogers' accusations about Hatch. Heck was not accused of, nor did he appear to admit, engaging in similar inappropriate behavior toward an inmate.

[19] Similar to her first claim, Hatch asserts claims under these statutes against both Defendants together and also individually.

circumstantial evidence.  <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279-81 (3d Cir. 2000).

In evaluating whether a causal connection exists between the protected activity and the adverse

employment action, courts have "focused on two main factors in finding the causal link

necessary for retaliation: timing and evidence of ongoing antagonism."  <u>Abramson v. William

Paterson College of New Jersey</u>, 260 F.3d 265, 288 (3d Cir. 2001).  While evidence with respect

to timing may be conclusive, a court need not examine the timing of the adverse employment

action if the plaintiff "has presented additional evidence to prove the causal nexus," which may

include evidence probative of ongoing antagonism from her employer.  <u>Id.</u> at 288-89.

      Once a plaintiff has established a prima facie case of retaliation, the burden returns to the

defendant to articulate a legitimate non-discriminatory reason for the adverse employment

action.  <u>Williams</u>, 380 F.3d at 759.  If the defendant is successful in articulating such a reason for

the employment action, the burden returns to the plaintiff to show that the stated reason was

pretextual.  <u>Id.</u> at 759 n.3.

### 4.      Hatch's ADA and PHRA Retaliation Claims

      In support of her retaliation claim under the ADA and PHRA, Hatch states that she can

establish a <u>prima</u> <u>facie</u> case of retaliation because: she engaged in protected activity by

requesting and taking medical leave (which was taken pursuant to the FMLA); she experienced

an adverse employment action when she was terminated from her position; and there was a

causal link between her protected activity (the medical leave) and her termination.  (Doc. No. 84-

1 at 13-14.)  Defendants maintain that Hatch fails to establish a <u>prima</u> <u>facie</u> case of retaliation

because she cannot establish "protected activity occurring previous to her termination," and that

"she has failed to proffer any evidence supporting a causal link between any protected activity

and her termination."  (Doc. No. 78 at 12.)

As to the first prong of a prima facie case of retaliation, the Court concludes that Hatch engaged in protected activity by requesting and taking medical leave. Butler v. BTC Foods, Inc., No. 12-0492, 2014 WL 336649, at *7 (E.D. Pa. Jan. 30, 2014) (stating that a request for a reasonable accommodation constitutes protected activity for purposes of a retaliation claim under the ADA and PHRA). In addition, she clearly experienced an adverse employment action when she was terminated. However, as explained below, the Court concludes that Hatch has not pointed to evidence sufficient to permit a reasonable factfinder to conclude that she has met the third element of a prima facie case – that there was a causal link between the protected activity and her termination.

In asserting that there is a causal link between the protected activity and her termination, Hatch states that "Sullen telling [her] that she could not perform her job because of her disability and medication, which occurred immediately upon [her] return from medical/FMLA leave in late March 2014" is direct evidence of retaliation and thus renders summary judgment improper. (Doc. No. 84-1 at 15.) Hatch also states that the temporal proximity between her request for leave and her termination, as well as "ongoing antagonism" from Defendants, constitute evidence sufficient to permit a reasonable factfinder to conclude that a causal link exists between the two events.

a. **Direct Evidence: Comment by Sullen**

With respect to the alleged comment by Sullen in relation to Hatch's disability, the Court concludes that such evidence is insufficient to support Hatch's claim. As the Court has noted above with respect to this alleged comment by Sullen in relation to Hatch's claim of disability discrimination, Hatch has not provided sufficient evidentiary support for this allegation in order to meet her burden in defeating summary judgment. LeBoon, 503 F.3d at 232 n.9; Solomon, 41

F. App'x. at 586; <u>Cridland</u>, 929 F. Supp. 2d at 389-90; <u>Fusco</u>, WL 4911938, at *11.  The Court

will therefore examine Hatch's circumstantial evidence of temporal proximity and ongoing

antagonism with respect to causation.

### b.    Temporal Proximity

As to temporal proximity between her request for and use of leave and her termination,

Hatch states that she "was terminated less than one week after returning from medical leave (and

within one month of requesting medical leave)," and that "[s]uch temporal proximity creates an

inference of causation."  (Doc. No. 84-1 at 16.)  The Court is unpersuaded that an inference of

causation is appropriate here.  FCJ's investigation into Rogers' allegations began in February of

2014, and Rogers was first interviewed by the prison PREA Investigation team on February 18,

2014.  (Doc. No. 71 ¶ 91.)  Hatch was interviewed by the FCJ PREA team on February 25, 2014.

(<u>Id.</u> ¶ 99.)  She then requested FMLA leave from Human Resources on February 26, 2014, and

was granted full leave from February 26, 2014 to March 25, 2014.  (<u>Id.</u> ¶ 101.)  Hatch

subsequently returned from leave on March 24, 2014 (<u>Id.</u> ¶ 109), and on March 25, 2014, one

day later, Hatch was interviewed by prison officials.  (<u>Id.</u> ¶ 110.)  "Between March 25, 2014, and

March 31, 2014," Sullen completed the memorandum documenting the findings of the

investigation, and Hatch was terminated on March 31, 2014.  (<u>Id.</u> ¶ 112.)

Although Hatch's termination occurred one day after she returned from leave, the

relevant timeline indicates that the investigation of Rogers' accusations, which ultimately

prompted Hatch's termination, commenced before the County became aware of Hatch's request

for leave.  Such circumstances indicate a lack of causation.  <u>Reifer v. Colonial Intermediate Unit</u>

20, 462 F. Supp. 2d 621, 639 (M.D. Pa. 2006).[20]  Therefore, despite the close temporal proximity between Hatch's termination and her use of leave, temporal proximity does not support an inference of causation in this instance.

### c.    Ongoing Antagonism

Hatch also argues that she can establish a causal link between her medical leave and her termination through evidence of "ongoing antagonism" on the part of Defendants.  A court may consider the evidence as a whole when determining whether causation is established for purposes of retaliation, including evidence of ongoing antagonism or "retaliatory animus" by the employer toward the plaintiff as a result of the plaintiff's request for leave.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000).  In support of her argument that such antagonism exists, Hatch offers evidence pertaining to the alleged comment by Keen that "if her mental health problem was that bad, she should 'go find a job someplace else.'"  (Doc. No. 84-1 at 16, Hatch Dep. at 147:25, 148:1-7, 152:16-20.)  As the Court has previously noted, this alleged assertion is insufficient evidence to support an inference of a discriminatory motive on the part of Defendants.  LeBoon, 503 F.3d at 232 n.9; Solomon, 41 F. App'x. at 586; Cridland, 929 F. Supp. 2d at 389-90; Fusco, WL 4911938, at *11.  Hatch also states that, "in response to [Hatch's] request to take time off because of her panic disorder in February 2014," Sullen told her "you're not fucking going anywhere until this report is done."  (Doc. No. 84-1 at 16, Hatch Dep. at

---

[20] In Reifer, the court found "that the plaintiff has failed to establish a genuine issue of fact as to the defendant's alleged retaliation against the exercise of her rights under the ADA and the FMLA because she cannot show a causal relationship between the defendant's notice of [her protected activity] and the process leading to her termination."  Reifer, 462 F. Supp. 2d at 640. Notably, the court also stated "the record is clear that the plaintiff had already been terminated before she filed the complaint."  Id. at 639.  In the instant case, although Hatch was terminated after engaging in protected activity, the investigation leading to her termination had already begun prior to her taking medical leave.  Therefore, the Court finds that the timeline of events surrounding Hatch's termination provides insufficient evidence to support a finding of causation on the basis of temporal proximity.

160:18, 161: 6-7.).  Similar to the comment allegedly made by Keen, the only support for

Sullen's alleged statement that Hatch provides to the Court is Hatch's own testimony from her

deposition.  Neither statement evidences any type of discriminatory animus or attitude on the

part of Defendants with respect to Hatch's use of medical leave.  Accordingly, the Court finds

that Hatch has failed to point to sufficient evidence of ongoing antagonism from Defendants and,

therefore, has not shown evidence sufficient to support a finding of a causal connection between

her use of medical leave and her termination.  Because Hatch has failed to point to sufficient

evidence to establish the causation element of a prima facie case of retaliation under the ADA

and PHRA, Defendants are entitled to summary judgment with respect to Hatch's ADA and

PHRA retaliation claims.

> **5. Legal Standard Applicable to ADA and PHRA Disability Discrimination Claims: Hostile Work Environment**

A plaintiff may also assert a claim for disability discrimination in violation of the ADA

and PHRA under a hostile work environment theory.  Courts have accepted the application of the

general hostile work environment framework for Title VII claims to claims of disability

discrimination asserted under the ADA.  Walton v. Mental Health Ass'n of Southeastern Pa., 168

F.3d 661, 666 (3d Cir. 1999).  The following framework applies to hostile work environment

claims in the context of disability discrimination:

> To establish a hostile work environment claim, an ADA plaintiff must show that
> he suffered intentional discrimination because of his disability; the discrimination
> was "sufficiently severe or pervasive to alter the conditions of [his] employment
> and create an abusive working environment"; the discrimination detrimentally
> affected him; and it would have detrimentally affected a reasonable person in his
> position.

Mercer v. Southeastern Pa. Transit Auth., 26 F. Supp. 3d 432, 443 (E.D. Pa. 2014) (alteration in

original) (citing Walton, 68 F.3d at 667).  In deciding whether a plaintiff has demonstrated the

existence of a hostile work environment, courts should look to the totality of the circumstances. Id. (internal citations omitted) (citing Mandel v. M&G Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013)) ("When deciding whether those elements are established, courts must evaluate the record 'as a whole'… Relevant circumstances may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'").

In order to establish that harassment is sufficiently severe or pervasive to satisfy the standard set out above, a plaintiff must demonstrate that the workplace in question was "permeated with discriminatory behavior" so as "to create a discriminatorily hostile or abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 17 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986)). Moreover, "[t]his standard requires an objectively hostile or abusive environment – one that a reasonable person would find hostile or abusive – as well as the victim's subjective perception that the environment is abusive." Id. (citing Meritor, 477 U.S. at 64, 67). In addition, the employer must be liable for the alleged hostile work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate…authority over the employee.").

**6.    Hatch's Hostile Work Environment Claim**

Hatch asserts a hostile work environment claim against both Defendants under both the ADA and the PHRA. Because both statutory frameworks may be analyzed coextensively, the Court will examine Hatch's claims under both statutes simultaneously.

**a.    Discrimination Because of Disability**

In support of her claim of a hostile work environment, Hatch argues that she can prove the first element set out above by asserting she "was subjected to blatantly discriminatory, offensive comments by Captain Sullen, Warden Keen, her Lieutenant supervisors and her co-workers regarding her mental health conditions and mental health medications." (Doc. No. 84-1 at 18.) Defendants argue that Hatch simply fails to produce sufficient evidence to permit a reasonable factfinder to conclude that she was subjected to a hostile work environment because of her disability. (Doc. No. 78 at 14.) To support this first element, a plaintiff's evidence must show that the comments were made because of the protected characteristic in order to rise to the level of being considered discriminatory. Donaldson v. Norfolk Southern Ry. Co., No. 10-cv-1556, 2011 WL 3568843, at *6 (M.D. Pa. Aug. 15, 2011); see also Johnson v. PSI Pizza, Inc., No. 3:11-1698, 2014 WL 123651, at *6 (M.D. Pa. Jan. 14, 2014). However, the comments alleged by Hatch appear to be the extent of her evidence with respect to the first element of a hostile work environment claim,[21] and viewing the totality of the circumstances of this case, the Court is unpersuaded that Hatch has pointed to evidence sufficient to satisfy this element of a hostile work environment claim. However, in the interest of completeness, and out of an abundance of caution, the Court will also examine whether Hatch has presented sufficient evidence with respect to the "severe or pervasive" element.

### b.    Severe or Pervasive

---

[21] Doc. No. 84-1 at 18. In support of her argument that she "was subjected to discriminatory comments and treatment because of her disabilities and perceived disabilities," Hatch asserts only that she "was subjected to blatantly discriminatory, offensive comments by Captain Sullen, Warden Keen, her Lieutenant supervisors and her co-workers regarding her mental health conditions and mental health medications." (Id.) While the relevant part of Hatch's brief does not explain the specific comments to which she refers, the Court assumes that Hatch is referring to the alleged comment by Keen that "if her mental health problem was that bad, she should 'go find a job someplace else,'" and statement from Sullen that "You're not fucking going anywhere until this report is done." (Id. at 16.)

Hatch also asserts that the conduct to which she was allegedly subjected by Defendants was sufficiently severe or pervasive to constitute a hostile work environment on the basis of her disability. In support of this contention, Hatch states that "the comments made by Ms. Hatch's managers and supervisors regarding her mental health were intimidating, ridiculing and harassing." (Id. at 19.) Hatch relies on her own testimony, asserting that she "testified that these comments were made to her 'almost every day,'" and "[t]hus, Defendants' conduct is severe or pervasive." (Id. at 20.) Similar to Hatch's argument with respect to the first element of a hostile work environment claim, Hatch's reference to her own testimony appears to be the extent of her evidence offered in support of this element. As previously discussed by the Court (see supra 17), Hatch's reliance on her own testimony is insufficient to survive Defendants' motion for summary judgment.

Moreover, the Court is persuaded by Defendants' arguments that, even if Hatch's own testimony were sufficient to survive a motion for summary judgment,[22] the alleged treatment to which Hatch refers would not rise to the level of conduct that is sufficiently severe or pervasive to constitute a hostile working environment. Because "[t]he threshold for pervasiveness and regularity of discriminatory conduct is high," the conduct complained of must be "so severe and pervasive that it 'alters the conditions of the victim's employment' and creates an 'abusive working environment.'" Greer v. Mondelez Global, Inc., 590 Fed. Appx. 170 (3d Cir. 2014). To that end, "mere offensive utterances" do not create a hostile working environment. Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001) (citing Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998)). The Court concludes that the conduct complained of by Hatch does not

---

[22] See supra 17, 23, 25.

constitute more than mere offensive utterances and, consequently, Hatch has not shown that the conduct was severe or pervasive.

In light of the Court's conclusion that Hatch has failed to establish the first two elements of the applicable framework for a hostile work environment claim, the Court need not resolve the issue of whether Hatch has presented sufficient evidence in regard to the remaining elements. Accordingly, Defendants are entitled to summary judgment on Hatch's hostile work environment claim under the ADA and PHRA.

### B.     Hatch's FMLA Claims

#### 1.     Legal Standard Applicable to FMLA Retaliation Claims[23]

To establish a <u>prima</u> <u>facie</u> case of retaliation under the FMLA, a plaintiff must establish: (1) that she took leave pursuant to the FMLA; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the plaintiff's FMLA leave and the adverse employment action. <u>Lichtenstein v. Univ. of Pittsburgh Med. Ctr.</u>, 691 F.3d 294, 302 (3d Cir. 2012).

In determining whether the requisite causal connection exists, a court may examine evidence with respect to timing and ongoing antagonism by the employer. Temporal proximity between the conduct and the adverse employment action may be sufficient to establish causation, yet "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory

---

[23] The parties' briefs indicate uncertainty as to whether Hatch has asserted claims against Defendants under the FMLA only for retaliation, or for both retaliation and interference. Hatch's second amended complaint appears to allege that "Defendants committed interference and retaliation violations of the FMLA." (Doc. No. 31 at ¶ 52.) Defendants addressed both the retaliation and interference claims in their brief in support of summary judgment. (Doc. No. 78 at 18). However, Hatch's brief in opposition to Defendants' motion for summary judgment states that "Ms. Hatch has not asserted an FMLA interference claim but instead an FMLA retaliation claim. As a result, she will not respond to Defendants' argument regarding FMLA interference." (Doc. No. 84-1 at 22.) Accordingly, in light of Hatch's representation, the Court will construe Hatch's FMLA claim as one based solely on retaliation.

motive before a causal link will be inferred." Williams v. Phila. Housing Auth. Police Dept., 380

F.3d 751, 760 (3d Cir. 2004) (citing Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189

(3d Cir. 2003)). With respect to evidence of antagonism by the employer, a court may infer

causation in situations where employers display a pattern of ongoing antagonism during the time

between the employee's involvement in protected activity and the adverse employment action.

Abramson, 260 F.3d at 288-89.

### 2. Hatch's FMLA Retaliation Claims

Defendants argue that Hatch cannot establish a prima facie case of retaliation under the

FMLA because there are no facts that would permit a reasonable factfinder to conclude that there

was a causal link between Hatch's leave and her termination, in light of the fact that Hatch

requested leave after the investigation into Rogers' allegations had begun. (Doc. No. 78 at 20.)

The Court concludes that Hatch's request for and use of FMLA leave constitute protected

activity for purposes of a retaliation claim under the FMLA, and further, that Hatch suffered an

adverse employment action when she was terminated from her employment with the County.

However, the Court is persuaded by Defendants' argument that Hatch has failed to produce

evidence sufficient to permit a reasonable factfinder to conclude that a causal link exists between

her FMLA leave and her termination.

The parties' arguments and the Court's analysis pertaining to the causation element of

Hatch's FMLA retaliation claim are similar to those regarding Hatch's retaliation claims with

respect to the ADA and PHRA, as discussed previously. Hatch first points to the temporal

proximity between her return from FMLA leave and her termination, arguing that the period of

time between these two events "is unusually suggestive, and, as a result, created an inference of

retaliation." (Doc. No. 84-1 at 23.) Hatch further asserts that she "was subjected to extremely

antagonistic treatment and comments" regarding her medical conditions and resulting "need for time off." (Id.)  In support of this argument, Hatch, again, refers to the comment allegedly made to her by Sullen ("You're not fucking going anywhere until this report is done."), when Sullen instructed her to write an incident report, as well as his alleged statement that Hatch would be unable to work for Defendants due to her mental health conditions, for which she requested leave.  (Id.)

As the Court has already noted in its analysis of Hatch's ADA and PHRA retaliation claims, Hatch has not provided sufficient evidentiary support for these assertions to survive summary judgment, instead appearing to rely only on her own testimony that these comments were made to her.  Moreover, even accepting the truth of these statements reported by Hatch, the Court concludes that these statements do not establish a pattern of antagonism that would permit a reasonable factfinder to determine that a causal connection existed between Hatch's use of FMLA leave and her termination.  Accordingly, Defendants are entitled to summary judgment on Hatch's FMLA retaliation claim.[24]

### C.    Hatch's Gender Discrimination Claims

#### 1.    Legal Standard Applicable to Title VII Gender Discrimination Claim Asserted Against County Defendant: Gender Discrimination[25]

In order to prevail on a claim of gender discrimination in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination.  This requires the plaintiff to show: (1)

---

[24] Hatch brought FMLA retaliation claims against both the County and Sullen in his individual capacity due to the possibility of individual liability for a violation of the FMLA.  The Court does not resolve the issue of whether Sullen constitutes a "supervisor" for purposes of FMLA liability because, even if Sullen were deemed a supervisor, the Court has concluded that no FMLA violation has occurred.

[25] Hatch asserts claims for gender discrimination under both Title VII and the PHRA.  Because the applicable analysis is the same for both statutes, the Court will interpret them coextensively. Atkinson v. Lafayette College, 460 F.3d 447, 454 n. 6 (3d Cir. 2006).

she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) those outside the protected class were treated more favorably. McDonnell Douglas, 411 U.S. at 802; see also Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981). In addition, the fourth prong may be established through evidence showing that the employment decision was made "under circumstances that give rise to an inference of unlawful discrimination." Id. A plaintiff is not required to show comparative evidence involving treatment of those outside the protected class in order to show that the adverse action was taken in circumstances allowing for an inference of discrimination; rather, "comparative evidence is just one manner in which a plaintiff can satisfy the prima facie requirement that the adverse action occur under circumstances giving rise to an inference of discrimination." Rey v. Univ. of Pittsburgh Sch. of Dental Med., 182 F. Supp. 3d 282 (W.D. Pa. 2016) (quoting Blunt v. Lower Merion Sch. Dist., 826 F. Supp. 2d 749, 758 (E.D. Pa. 2011)).

If the plaintiff makes the requisite showing and establishes a prima facie case of discrimination, then the defendant must articulate a legitimate non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the defendant meets this burden, then the burden returns to the plaintiff to show that the employer's stated reason is pretextual. Id. In evaluating the pretext element of the burden-shifting framework, a plaintiff must provide evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Palmer v. Fed. Express Corp., 235 F. Supp. 3d 702, 715 (W.D. Pa. 2016) (citing Michaels v. BJ's Wholesale Club, Inc., 604 Fed. Appx. 180, 182 (3d Cir. 2015)).

## 2.    Hatch's Gender Discrimination Claim[26]

The Court examines Hatch's claim for gender discrimination under the same burden-shifting framework used previously to assess Hatch's disability discrimination claims. Defendants argue that Hatch is unable to establish a prima facie case of gender discrimination because she "can point to no male employee with similar misconduct who was terminated, nor to any other evidence of disparate or differential treatment of a person whose offense was the same as hers." (Doc. No. 78 at 17.)

Hatch maintains that she can establish a prima facie case of gender discrimination, stating that "there is no dispute that [she] is the member of a protected class (female), that she was qualified for her position (as established via her long-term employment with Defendants) and that she was terminated." (Doc. No. 84-1 at 24.) Hatch further asserts that she "can also establish that she was terminated under circumstances giving rise to an inference of gender discrimination." (Id.) The Court declines to resolve the issue of whether Hatch has established a prima facie case of gender discrimination because the Court concludes, as explained more fully below, that even assuming she has established a prima facie case, Hatch has failed to point to evidence sufficient to permit a reasonable factfinder to conclude that the Defendants' articulated reason for her termination was pretextual.

As noted previously with respect to Hatch's disability discrimination claim, the County's articulated reason for terminating Hatch was "the admitted transgression of policies intimately related to the security of the [correctional] institution and the safety of the staff and inmates

---

[26] Hatch brings a claim for gender discrimination under Title VII only against the County, but asserts a claim for gender discrimination in violation of the PHRA against both Defendants, apparently on the basis of the PHRA's contemplation of potential individual liability for statutory violations.

therein." (Doc. No. 78 at 9.) In support of her position that Defendants' articulated reason was pretextual, Hatch argues that:

(1) she was subjected to blatantly discriminatory gender-related policies, established by Warden Keen;[27]

(2) she was subjected to extremely derogatory comments and treatment by her supervisors and co-workers, which she complained to management about (and for which no action was taken) and which many of Ms. Hatch's colleagues observed; [and]

(3) male correctional officers, who engaged in similar and even more egregious conduct than Ms. Hatch is alleged to have engaged, were treated much more favorably than Ms. Hatch (and were not terminated for their conduct).

(Doc. No. 84-1 at 24.)

In support of her second assertion – that she was subjected to derogatory comments and complained about them to the managerial staff at the jail – Hatch neither provides specific evidentiary support for this statement nor explains how any of the alleged comments relate to the issue of gender discrimination. Hatch's pretext argument appears to hinge on her third assertion: that male correctional officers who behaved similarly, or even worse, than Hatch allegedly behaved were treated differently than Hatch because they were not terminated. In this respect, Hatch appears to rely on the same comparative evidence of pretext that she did regarding her disability discrimination claims under the ADA and PHRA; while Hatch previously argued that evidence of disciplinary treatment of non-disabled employees established pretext, she now argues that the treatment of the same employees also evidences pretext with respect to gender discrimination because the employees in question are also male employees. Accordingly, because the Court has already discussed this comparative evidence (see supra 18-20), and

---

[27] Hatch's brief does not explain the specific evidence on which she bases this assertion. (Doc. No. 84-1 at 24.) In light of the evidence on the record, though, it appears that Hatch is referring to an alleged policy at FCJ under which female employees were not permitted to take out garbage. (Doc. No. 85 at 23.) However, the Court declines to examine this alleged policy because it is not relevant to the issues before the Court.

determined that the comparators are not sufficiently similar to support Hatch's allegations of pretext, the Court similarly concludes that this evidence is insufficient to permit a reasonable factfinder to find pretext as to Hatch's gender discrimination claim, as well.

While Hatch has asserted a Title VII gender discrimination claim against only the County, she asserts a PHRA gender discrimination claim against both Defendants. However, because Hatch is unable to meet her burden with regard to the pretext prong of the applicable burden-shifting framework and thus cannot establish a violation of Title VII or the PHRA, the Court need not resolve the issue of whether Sullen is individually liable under the PHRA. Accordingly, Defendants are entitled to summary judgment on Hatch's gender discrimination claim under both Title VII and the PHRA.

### 3. Legal Standard Applicable to Title VII Gender Discrimination Claim Asserted Against County Defendant – Hostile Work Environment

For a hostile work environment claim on the basis of sex discrimination, the applicable legal framework is described as follows:

> To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability.

Mandel, 706 F.3d at 167 (citing Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)).

### 4. Hatch's Hostile Work Environment Claim

Hatch's second amended Complaint also appears to allude to a claim of a violation of Title VII under a hostile work environment theory,[28] although Hatch does not address such a

---

[28] Doc. No. 31 ¶ 57. Hatch's Second Amended Complaint does not list a hostile work environment claim separately, but states, in relevant part, that Hatch "was also subjected to a hostile work environment during her period of employment with Defendant County due to her

claim in her brief in opposition to Defendants' motion for summary judgment. (Doc. No. 84-1.) Defendants, however, have addressed the claim in their brief in support of summary judgment. (Doc. No. 78.) In the interest of examining each issue briefed for the Court, the Court has reviewed this potential claim and concludes that the undisputed facts and the evidence provided by both parties indicate that Hatch has failed to point to evidence sufficient to permit a reasonable factfinder to conclude that she was subjected to a hostile work environment based on gender discrimination pursuant to the above standard. Accordingly, Defendants are entitled to summary judgment with respect to all potential gender discrimination claims under Title VII and the PHRA.

## IV.    CONCLUSION

For all of the reasons discussed above, Defendants' motion for summary judgment (Doc. No. 77), will be granted in its entirety. An appropriate Order follows.

---

gender through disparate treatment, pretextual admonishment, and demeaning and/or discriminatory treatment towards her." Id.